The next case, which is Goldman versus Picard. Good morning, Your Honors, and may it please the Court, my name is Joe Ghilardi, and I represent the Goldman Appellants. Before I address the specific errors made by the courts below, I think it's important to set out a few propositions and principles that are undisputed in this case. It is undisputed that a Section 28 claim necessarily is an independent claim that cannot belong to the trustee, that cannot be derivative of the trustee's claim, that asserts an independent duty, and that is a claim for damages that cannot be sought for the trustee. Thus, the sole question below, and the sole question on appeal here is, is the complaint the Goldman complaint, taking the allegations as true? Is it a Section 28 claim, or is it in reality a fraudulent transfer claim? This is something that I've been puzzled about on both sides' positions and on the district court's position. The district court said, I think, that this is not a matter of deciding a 12B6 motion. That is correct. Every court that has addressed these complaints and even other complaints that says, yes, we are not to engage in a motion to dismiss-like finding of whether the claim is true. What puzzles me is, suppose one did a 12B6 analysis and concluded that the 20A claim would survive a 12B6 motion. Wouldn't that necessitate a conclusion in your favor? I think it would, Your Honor. So some form of analysis would be appropriate. Now, suppose you did the 12B6 analysis and concluded that your charge does not state a claim. Well, I think that- What happens then? Well, I think that that's not the correct analysis, however, because every court, including J.P. Morgan, this court and J.P. Morgan said, we're not going to engage in that type of analysis. Well, but as we just established, it's a little odd to say we're just not going to engage in that because it would seem to short-circuit the entire matter. If the court looked at it and said, this is a perfectly fine 20A claim, it should go forward to discovery. So if that's true, wouldn't that be a controlling consideration? Again, I don't think so because the test is- I thought you told me that it was a minute ago, but maybe you're changing your mind? No, I think that if hypothetically the court were to go through that analysis, I'm saying that analysis isn't the proper test, nor is it one that's been engaged in by any of the courts. So if the complaint would not survive a 12B6 motion, what you're suggesting is there has to be more. It has to be not just an insufficient 20A claim, it has to be, what, a frivolous 20A claim? No. In this case- But wait, if it was a frivolous 20A claim, are you saying that by calling something a 20A claim, you get to escape the injunction even if the contention that this was a 20A violation is utterly frivolous? You can't be saying that, or maybe you can. No, I'm not saying that at all. What I'm saying is that in order to make the determination about whether this claim, this 20A claim, is subject to the injunction, yes, you must look at the allegations, but not to see whether the allegations are true or not true. That's- Well, not true or not true. That's never the standard even on a 12B6 motion. The question is, as a matter of law, it seems to me that we've already established that if it would survive a motion to dismiss, then it can't possibly be the case that it's subject to the injunction. Maybe they'll disagree, but that's your position, and it makes sense to me. And also that if it's an utterly frivolous 20A claim, then it probably is subject to the injunction. Again, I think if the claim was utterly frivolous in that hypothetical, that may color the court's analysis in determining whether the claim is stated as something other than. I would say, though, in this case, as we've briefed extensively, there are well-plaid allegations of- If it is a colorable 20A claim, then it is up to the court where the complaint has been filed to assess whether it survives 12B6 or not. But it would not be subject to the injunction because it is a colorable claim of a securities law violation, securities fraud case to categorize it broadly, that would belong to a subset of the Madoff investors. A subset of the creditors. Well, a subset of the creditors, but in this case, wouldn't it also be a subset of the Madoff investors in the sense that it could only be people who invested after this pickover behavior occurred? Absolutely correct. So there can't be a contention, well, maybe they'll dispute this too. It's hard for me to see how there can be a contention that the claim that you're making is one that applies universally to all the Madoff investors, let alone to any other Madoff creditor like the people who supplied electricity to the office or something like that. Correct. And that is our position and that is the fact in this case. The Second Circuit has addressed this issue and has articulated a test. And the test articulated in the first, in Fox 1, which was the adoption essentially of Judge Sullivan's analysis, is to look at the complaint and ask the question, is there something in here other than, more than, the conduct that constitutes the fraudulent conveyance? Also, in Greenwich-Fairfield, a case decided by the circuit at around the same time, the court asked the question, does the claim as alleged depend on the fraudulent conveyance claim? Is it necessarily contingent on there being a fraudulent conveyance? That's the language of this court. How was the complaint different though from the earlier two district court cases, Goldman 1, Goldman 2? Yes. In Florida and here? Yes. So the original complaint alleged transactions and accounts that reflected the fraudulent conveyances were the fraudulent conveyances themselves or the mechanics of making the conveyance, the reaching in by calling someone to make a withdrawal, the recordation of the fraudulent conveyance. This complaint is remarkably and far different. It goes back decades in time, beginning in 1992, and alleges loans, secret, illegal loans that propped up the Ponzi scheme. It alleges that Picower participated in the fraud itself by being a counterparty to fraudulent options transaction. That was the very strategy that Madoff was selling. Give me your money, I will put it in S&P Securities, and I'm going to hedge with options. So by agreeing to be a counterparty to those fraudulent transactions, that conduct resulted in direct misrepresentations and omissions, giving rise to the securities fraud and the control person claim. So that is how they're different. It has to be a control person claim, I take it, because to make it a 10-B-5 kind of claim, you couldn't do that because Picower would at most be an aider and abetter. That is correct, Your Honor. Because he doesn't make any statements. That's why it hinges on the idea that he is plausibly alleged to have been a control person of Bernard L. Madoff Investment Services? Of Blemis, yes, Your Honor. That is correct. All right. Mr. Glauer, you've used your time. We've got a couple minutes for rebuttal. Would you like to use them now, or do you want to come back? I'd like to come back, Your Honor. All right. We'll hear from Ms. Renner, then. Good morning, Your Honors, and may it please the Court. My name is Deborah Renner, and I represent the trustee, Irving Picard. Your Honors, this case concerns a straightforward application of an injunction that was approved by this Court in 2014. As you know, most of the allegations in the Goldman 3 complaint have been reviewed by either this Court or numerous lower courts in one of the previous iterations of the Goldman complaints, or in one of the complaints brought by a competing set of class action plaintiffs, the Fox-Marshall plaintiffs, in Fox-Marshall 1, 2, and 3. They've invented some new allegations, so let's focus on what's different about this complaint model. Okay. Before I get to the new allegations, I do want to talk about what you mentioned about the motion to dismiss. There was an injunction hearing in this case, and at the hearing, the judge asked for evidence regarding the loans. One of the new allegations are the loans, the so-called loans. The judge noted in the argument and questioned both sides about these loans because the loans are articulated in different ways, both in the trustee's complaint versus Goldman 3, and even within Goldman 3, they appear to be mere account— Did the court make a finding that there were no loans? Yes. The court made a finding that in actuality, the loans were nothing more—it made a factual finding that, in fact, the loans were nothing more than Picower's own account activity. And in fact, one of those loans— Does that actually make a difference? If Picower—suppose there were loans, right? There's a loan where it's explicitly a loan by contract. You're going to have this money, and then you're going to give it back to me later with it without interest. Or alternatively, suppose that Picower, knowing that this is a Ponzi scheme, but knowing that he has profited from it and will continue to profit from it, puts money in his own account, which he knows that whether he calls it a loan or he calls it an investment or anything else, Madoff is just going to use it to pay off whoever is at the door at that moment. And then later, when the Ponzi scheme is back going, Picower is going to be able to pull that money back out. Why does it make a difference whether it's characterized as a loan if he's giving Madoff money with the intention of bolstering what he knows is a Ponzi scheme? Now, again, I'm not saying that's enough somehow. I'm just saying why would that be different with respect to the analysis of is he engaged in a securities fraud conspiracy, or is he just somebody who's the beneficiary of fraudulent conveyances? Well, let me answer that in several ways. The first is that one of those purported loans, the $125 million loan, formed part of the settlement that the trustee and the Department of Justice had with the Picower parties. So that purported loan has been taken into account as account activity and settled. The other thing here is that if we're really talking about Picower's own account activity, this really falls within the realm of this Court's decision in Fox-Marshall 1, where there were conspiracy allegations, which were very akin to control person allegations. And the Court held that a derivative claim is a claim where a third party acts toward the debtor. Here a loan would be actioned toward a debtor, right? And in that case, all the other harms that flow to the creditors are secondary harms, because the action that Mr. Picower would have taken, had he indeed provided these loans under your hypothetical, would have pushed the debtor further into insolvency, would have prolonged the Ponzi scheme. That's a classic derivative claim under the jurisprudence of this Court. So let me also talk a little bit about the counterparty claim. Now, the Court below found that claim to be conclusory. And I know that Mr. Picower's counsel, Mr. Stein, is going to address all of the issues in how the two new sets of allegations, the loan allegations and the counterparty allegations, aren't supported by the criminal testimony. And in fact, there's even an admission in the hearing before Judge Bernstein that actually the loan allegations are based on the prosecutor's questions and not on the witness's answers. But Mr. Stein is going to address all of the issues as to why this is not a bona fide control person claim and these two new sets of allegations don't matter. And again, I'm trying to figure out how this could be distinguishable in a number of ways from a 12B6 analysis. One that's implicit in something that you've said is that because there is an injunction outstanding and the bankruptcy court is trying to enforce that injunction, the bankruptcy court could go beyond a 12B6 analysis and do a more rigorous scrutiny of the complaint to determine what exactly, whether it's in good faith, whether there is evidence that backs up the allegations, what would be the standard in determining that this is not a bona fide securities claim, a bona fide 20A claim? Well, if I heard your question correctly, you're asking me whether or not, you know, evidence is admissible in an injunction hearing. And of course it is. And of course, the scrutiny is greater in that sense than it would be on a 12B6. So that in contrast to what I suggested and Mr. Ghilardi agreed with, that if the complaint would survive a motion to dismiss in Florida, it still could be within the injunction if the bankruptcy court finds that there's not sufficient evidence yet to back up the complaint and therefore they're not going to get to do discovery in a way they might if their allegations were plausible, but not supported by evidence. Well, I guess what you're asking, does it make sense for the injunction to come before the motion to dismiss? And it does because the court can give it greater scrutiny. You know, not that that was required here, given the fact that these allegations didn't have, don't have any basis in the facts that purport to support them. Let me move on, if I may, to the JP Morgan case, because there's a lot made of it in the brief by Mr. Ghilardi. The JP Morgan case is a case that deals with the trustee's standing to bring common law claims. It's very different from an injunction context, particularly here when the injunction says on its face that it extends beyond claims that the trustee could have brought. It extends to claims that derive from those claims. So even on the face of the injunction, it's clear that the trustee doesn't need to have standing to enjoin claims that he himself could not bring. And that, again, is consistent with this court's holding in Fox Marshall 1, which was the conspiracy case. And again, no matter how much they try to shoehorn themselves into the facts of the JP Morgan case, as this court held in that case, there were independent actions, particularized actions by the banks, by HSBC, as an administrator of various feeder funds by JP Morgan, as the bank that held the 703 account that customers put money in and out of. There were individualized actions, particularized actions that weren't directed at BLMIS, but were directed at customers. And that's what made that case a case where the trustee wouldn't have standing to bring those claims. He didn't own those common law claims, according to this court. That's not the case here. There's not one iota of an allegation of any particularized conduct toward any particular customer, not toward any named plaintiff, not toward any absent class member. Isn't that true of Madoff himself? I mean, he makes fraudulent statements to the world, right, that might make him, I guess, did make him liable for securities fraud. They're not made to one person. They may be subsets of statements that he made face to face to different people. But basically, he's making statements to the world. And people who rely on that, or who can rely on a fraud on the market theory or something, are able to bring those claims. They're not derivative claims, derivative of the Madoff estate of all people, right? And I guess what I'm saying is, if this is a legitimate securities fraud claim, if there were some basis for saying that Mr. Pickover is guilty of acts that would make him liable for securities fraud, in what sense is that a derivative claim? I think that's a difficult question to answer. And fortunately, it's one that you don't need to answer on the facts of this case, because I think what you're pointing to is kind of two different bodies of case law that almost collide in that scenario, right? Because you have this definition of a derivative claim, where in order to be independent, there needs to be particularized conduct toward a plaintiff. And meanwhile, you have this argument that if there's this legal duty, automatically a controlled person claim would be an independent claim. That case hasn't been decided yet. And what I'm saying is, you don't need to decide that here. If he were to say, issue a press release saying, I've investigated Mr. Madoff's books and their goal, that's amazing what he can do, knowing that those are totally false statements, and he did that as part of the Madoff scheme, that would not be a claim that goes, how would that be a claim that goes to the estate? That's the easy case, right? Because this court has already decided in Manville III and in Hirsch, when there's some sort of action like that, like a misrepresentation made by a party, be it an insurance company, as in Manville III, or an accountant, like in the Hirsch v. Arthur Anderson case, then that's the easy case. And this court has held those claims are independent, but we don't have that here. But here, the basic problem may be that all Pickover is accused of being is a sort of run-of-the-mill aider and abetter, who, and again, you're suggesting, and I'm sure his counsel will say so even more emphatically, you're arguing he's not. But even taking the allegations at face value, all he's really doing is helping in a way that does not generally make someone liable in a private securities product. Yes, and he's driving the debtor further and further into insolvency. Thank you, Your Honor. Thank you. Stein? May it please the Court. Judge Lentz, I'd like to pick up with your initial question about how the inquiry here differs or doesn't differ from a 12 v. 6 inquiry. It's not the same thing. It's not a 12 v. 6 motion. But it is, as this Court has said, you can't just look at the label. They can't just take some allegations that relate to Pickover and slap the control person label on it. It has to be a bona fide control person claim. I would say colorable is another way of putting it. I would say there has to be some logical connection at a minimum between the facts that they allege and a conclusion that Mr. Pickover was a control person. There has to be a—it can't be a non sequitur. There has to at least be a sequitur. And there isn't any here. And I think the easiest way of showing that they haven't pled a bona fide or colorable control person claim is to look at their argument as to why they have. And we heard it again this morning from Mr. Ghilardi, and it's on page 25 of their brief. Quote, control requires actual knowledge of the fraud and some facilitation by the defendant. That's the same argument they made below to Judge Bernstein. That's just not an accurate statement of the law. We're not in the universe of control person liability. Maybe we're in the land of the culpable participation element of control person liability in this circuit. That's not even an element in the Eleventh Circuit, which is applicable here. The Eleventh Circuit test is whether the defendant had the power to control the general business affairs of the primary violator and had the requisite power to control the specific policy or misrepresentations at issue. The Golemans cite one case for the proposition that I just stated, that knowingly participating in the primary violation is sufficient to render someone a control person. That's SEC v. Jackson, a district court decision from the Fifth Circuit, first of all. It doesn't say that knowledge and control is sufficient. It's a case where the defendant was the CFO and then the CEO of the company who approved the alleged misdeeds, and we look back at the briefs. He didn't contest the element of control. He was arguing only that the complaint failed to plead that he participated in the scheme. How about the counterparty allegations to the options? Is that different? It's not different at all, Your Honor. In the first place, and again, we've argued the facts in the brief. We don't think that the testimony, when you look at it, shows that Mr. Pickhower ever agreed to pretend to be the counterparty, and it certainly doesn't show that he ever actually made any misstatements to any auditor or regulator. But put that two aside. He was listed on the Madoff books as such, right? Yeah, and according to the testimony, fraudulent records were generated by BLMIS with respect to Pickhower accounts and the other individuals who supposedly agreed to serve. Major financial institutions had been listed on Madoff's books in the past. Yes. Counterparties that they knew nothing about. They presumably didn't reach an agreement, and Madoff's plan obviously was to show these I think he did trust, and again, it's not just Mr. Pickhower, it's several large investors that if they got a call, they would just hang up. But even if you accept all these allegations as true, and Madoff asked Mr. Pickhower and others to do this, how does that give Mr. Pickhower control over the general business affairs of BLMIS or the specific misrepresentations at issue, let alone over the whole scheme? This is something that happened at the very tail end in 2008. It simply doesn't. It's glaringly obvious from the plaintiff's own allegations that the person controlling all this activity was Bernie Madoff. It wasn't Jeffrey Pickhower or the other investors. The theory seems to be, behind their control person theory, that if somebody does something that is important or instrumental to the fraudulent scheme, that gives rise to control person liability. That's just not the case. We dispute that that happened factually, but if you look at, and we cited in our brief, Judge Kodal's decision in a control person claim in the Madoff case brought against J. P. Morgan, perhaps more relevant here, a similar decision by the Middle District of Florida within the 11th Circuit, also dealing with the control person claim against J. P. Morgan. They were tossed, notwithstanding that the allegation was the same, that the scheme to involvement or that J. P. Morgan was indispensable to Madoff's fraudulent scheme, the courts in both those cases said, how does that plead control? It doesn't. I'm dismissing the case because it doesn't plead control. The plaintiffs in their reply brief pretended that in Judge Kodal's decision, he dismissed the case because it didn't meet the culpable participation requirement. It's true that he found in the alternative that the complaint hadn't alleged culpable participation, but he found first and foremost that this didn't, was not a culpable allegation of control, which is clearly correct under the case law. With regard to the loans, again, in the first place, the, what plaintiffs are calling loans were actually deposits made to Mr. Picower's account at BLMIS. The claim that they have made that these, you know, two supposed loans didn't go through the Picower's accounts, had nothing to do with the Picower's accounts, is contradicted by the very trial testimony on which they rely. Mr. DePascale said that the $76 million in securities involved in the 2002 transaction were received into Picower's account. That's at 1182 and 1191 of the joint appendix. As I suggested before, I'm puzzled about what that means. There are no accounts. That's the whole nature of this scheme. Money gets whatever the, whatever Mr. Picower thought they were. What they, what they in fact were, was done with the money was apparently that it was given to some other investor who wanted to cash in, and at that moment, Madoff needed some extra funds. So whose, you know, whose account it went in doesn't seem to make much difference, does it? I agree with you it doesn't make, make a difference. I think it, the fact that it did, strengthens — But you're saying that that, it suggests that this is not a loan. It was recorded in his account. It was recorded in his account. Well, well, well, well, within the case of the loans, the $76 million in securities actually went into his account. And the $125 million actually was wired into his account in April of, of 2006. That's clear from the testimony. It's also clear, I should add, from a submission we made that is not in the joint appendix and it's not on PACER, but is a letter dated February 26, 2015 that we supplied to Judge Bernstein at his request that contained copies of the account statements showing that those transactions in fact went through accounts for Mr. Picower. And it just, it highlights, Your Honor, I think the fact that this is all about the subject of the permanent injunction. But I also agree with you that even if it didn't go through his accounts, what difference does it make? It doesn't make any difference because it still doesn't show that Picower had control over the general business affairs of BLMIS or the specific misrepresentations at issue. I just follow up a question that Judge Lynch pointed out, which is, I thought there were allegations as to the options counterparty arrangement. There were allegations that Picower agreed to be listed as counterparty to those options so that it would be displayed to the public that he was involved in those. Am I right about that? I don't think that's correct. I think the context was an auditor for a particular investor, not one of the plaintiffs, was coming in and Mr. Madoff, in the past, had sort of made them go away by saying, we have these option trades, the counterparties are these big institutional banks, and that was sort of accepted at face value. In 2008, when even large institutional banks were not doing so well, he was concerned that that wouldn't be accepted at face value, and he came up with this alternative plan to create a document and show it to these auditors that showed that the parties on the other side of these phony, utterly phony option trades were large investors in BLMIS, including Mr. Picower. But it wasn't for public consumption. I don't believe the record shows that, or there's an allegation. He agreed not to disclose that the options trading was fake. Isn't there that allegation in the complaint? I mean, Picower agreed that he would be part of the scheme to hide that he's not. There's an allegation that, yes, there's an allegation that there was an agreement in which Mr. Picower, if he got a call from this auditor, or from a regulator, would say that. But the testimony in which that is based comes from Frank T. Pascali, Mr. Madoff's right-hand man throughout this fraud, and he doesn't say that Mr. Madoff ever told him he spoke to Picower or these other investors, or that Picower or any of the other investors actually did that. And by the way, Judge Joni, as I said, Mr. D. Pascali, Madoff's right-hand man through the fraud, he testified, and this is in the record, that he never met Mr. Picower. He never spoke to Mr. Picower in his life. That's on Joint Appendix 1245, 1255. Again, this is not a colorable control person claim. There could not have been a control person, some shadow puppet over Madoff, who had no contact with Frank D. Pascali. Thank you. Mr. Glardy, you have a couple of minutes. Thank you, Your Honor. Before I address those arguments, this Court has held for twenty years that whenever a defendant is alleged to have participated in a fraud, which is well-plaid in our complaint, that claim always belongs to the investors, and it never belongs to the trustee, even if there are fraudulent conveyances by the same defendant. To hold otherwise in this case would undo J.P. Morgan. This case is exactly the same as J.P. Morgan, as far as the propping up goes. Can I spend your time on whether there are plausible allegations of control person, because I think that's where a lot of the argument has focused. The law and control person, which is stated in the Lautenberg case, which we cited, is that control can be knowledge of the fraud and inaction that prevents discovery of the fraud or participation of the fraud. That is the law. If that were true, then an awful lot of lawyers and accountants would be back on the hook that the Supreme Court took them off with the Stone Ridge case, right? If it's enough to be a control person that you aid and abet and don't blow the whistle, how does that . . . that doesn't compute to me. Then the next step is, did you have control or the ability to control? Okay. That's what they've been complaining about. The case law is that the ability . . . making loans under the Mecca case can be control. That's exactly . . . Madoff was not a typical lender who documented all of his loans. He was, like Mecca, someone involved in the Ponzi scheme that propped it up through the loans. All of this discussion about whether there is a bona fide 28 claim, again, what they are asking this court to do is weigh allegations, make inferences from testimony . . . Yeah. They're asking us to do two things that are different than a 12B6 analysis. One is more favorable to you than a 12B6 analysis. That is, maybe it needs to be frivolous or not colorable. But the other is, unlike a 12B6 claim, because there is an injunction preliminary hearing involved, we can actually probe a little deeper, or at least the bankruptcy court could probe a little deeper, into what are the actual bases for these allegations. And therefore, it might be open to us, as it might not be in a 12B6 case, to consider pretty strongly whether the testimony that is the claimed basis for these allegations actually bears them out. And now, maybe those are both wrong. I'd be interested in your views on whether we can do either, or should do either of those things. If I can conclude with two points to answer that question, then make one more point about the control allegations. In Fairford, Greenwich, that case came up in the context of injunctions. The trustee wanted to enjoin settlements. And the court determined, both the district courts, Judge Rakoff, and the name escapes me, the other judge, no one compared or weighed allegations, tested whether it was an actual claim. All the court looked at, even in the context of an injunction was, is this something other than a fraudulent conveyance, which I think this court has repeatedly said, both in Fox and in Fairfield, and even more recently in Tronix, where it took a look at what was actually being pled, that's the standard, that's how the test should be applied. As to whether this would and does plead a bona fide 28 case, again, we have alleged that Picower had day-to-day control over the books and records. Now while that may, is not as relevant to the question of whether we've alleged something other than a fraudulent conveyance, the notion that he can reach in and alter the books and records and take money out is indicia of control. And there's case law that we cited in our brief that suggests that that's sort of day-to-day control. Would you support the allegation that Picower could reach in and alter the books or reach in and take money out in any way that some other investor could not, just by asking to withdraw his funds? Yes, although it's not alleged in the complaint, we know from the trustee's complaint that he could call up someone at Blemis and say, I need this return this time. I need 20%, and they would give it to him. So that shows day-to-day control. As much as anything else, with the loans, with the ability to say I'm not going to loan, the ability to not loan or to call the loans is equally control. Thank you, Mr. Clary. We'll reserve decision on this case.